ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL II

| GILBERTO SUÁREZ MIRANDA Y BETZAIDA ORTIZ RODRÍGUEZ<br><br>Parte Recurrente<br><br>v.<br><br>OFICINA DE GERENCIA DE PERMISOS (OGPe)<br><br>Parte Recurrida | TA2026RA00089 | *REVISIÓN ADMINISTRATIVA* procedente de Oficina de Gerencia de Permisos<br><br>Caso Núm.: 2021-403467-SDR-303367<br><br>Sobre: Solicitud de Permiso de Consulta de Ubicación para la Segregación de un Terreno con Cabida de 127,305.5130 Metros Cuadrados según Escritura y 126,847.1543 Metros Cuadrados según Mesura para formar 26 Solares Residenciales para Vivienda Unifamiliar Aislada |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, el Juez Rodríguez Flores y Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 17 de junio de 2026.

Comparecen ante *nos* Gilberto Suárez Miranda y Betzaida Ortiz Rodríguez (en conjunto, los recurrentes) y nos solicitan que revisemos una *Resolución de Revisión Administrativa* emitida el 2 de febrero de 2026, por la División de Revisiones Administrativas (DRA) de la Oficina de Gerencia y Permisos (OGPe o recurrida). Mediante dicho dictamen, la DRA determinó archivar la solicitud de revisión administrativa 2021-403467-SDR-303367.

Por los fundamentos que expondremos a continuación, *confirmamos* el dictamen recurrido.

**I.**

Con fecha del 18 de mayo de 2025, la parte recurrente presentó una consulta de ubicación ante la OGPe, bajo el trámite 2021-403467-CUB-011925. Dicho proyecto ubica en el Barrio Gato del Municipio de Orocovis y se encuentra en un distrito calificado como Agrícola Productivo, según el Plan de Ordenamiento Territorial para el Municipio de Orocovis.

Así las cosas, el 18 de septiembre de 2025, la OGPe emitió una *Resolución de Consulta de Ubicación* no favorable para la consulta de ubicación 2021-403467-CUB-011925. En la misma, la OGPe determinó que:

> [e]sta solicitud de Consulta de Ubicación ha sido examinada y analizada por la OGPe, a base de la totalidad del expediente administrativo, a la luz de la información suministrada por la parte proponente, las disposiciones de leyes, reglamentos y normas de planificación vigentes y del resultado del estudio desde el punto de vista ambiental. Se concluye que el desarrollo propuesto no cumple con los objetivos del Plan de Uso de Terrenos de PR, toda vez que, promueve la lotificación de terrenos agrícolas en parcelas o fincas pequeñas, no preservando la finca en unidad del tamaño adecuado para que su operación agrícola sea económicamente viable. Tampoco se cumple, entre otros, con las Secciones 6.3.2.3 y 6.3.2.4 del Reglamento Conjunto, pues se estaría afectando la productividad agrícola de los terrenos, así como su valor natural, y el proyecto ubica en terrenos susceptibles a deslizamientos y no cuenta con comentarios de la Unidad de Hidrogeología de la Junta de Planificación. De otra parte, la propuesta no cumple con la Sección 5.1.9.2 al proponer utilizar sistema privado de inyección subterránea de tanque séptico y filtrante, ni con la Sección 5.1.2.2 al no proveer un análisis se riesgos a deslizamientos (Estudio Geotécnico) que viabilice el desarrollo de los terrenos.

En atención a lo anterior, el 6 de octubre de 2025, la parte recurrente presentó una *Solicitud de Reconsideración* ante la DRA. Posteriormente, el 21 de octubre de 2025, la DRA emitió una *Notificación Acogiendo Solicitud de Revisión Administrativa.* Subsiguientemente, el 30 de diciembre de 2025, la DRA emitió un *Aviso de Vista de Revisión Administrativa* mediante la cual señaló la Vista Administrativa para el 20 de enero de 2026 a las 9:30 a.m., mediante la plataforma Microsoft Teams.

El 20 de enero de 2026, se celebró la Vista Administrativa a la cual compareció el Ing. Rafael Ángel Zayas Rolón en representación de la parte recurrente y el Lcdo. Israel Pagán Velázquez en

representación de la parte recurrida. Sin embargo, los recurrentes no comparecieron. Así, surge del dictamen recurrido que el Oficial Examinador concedió un término de treinta (30) minutos al Ing. Rafael Ángel Zayas Rolón para que se comunicara con la parte recurrentes y estos comparecieron a la Vista Administrativa. Tras varios intentos del Ing. Rafael Ángel Zayas Rolón para lograr comunicación, la parte recurrente no compareció. Así pues, el Ing. Rafael Ángel Zayas Rolón solicitó un reseñalamiento de vista, la cual fue declarada *No Ha Lugar*.

En vista de ello, el 26 de enero de 2026, el Oficial Examinador emitió un *Informe de Vista Administrativa*. El 2 de febrero de 2026, la DRA emitió una *Resolución de Revisión Administrativa* mediante la cual determinó archivar la solicitud de revisión administrativa 2021-403467-SDR-303367. Inconforme con dicho proceder, el 4 de marzo de 2026, la parte recurrente compareció ante *nos* mediante un recurso de *Revisión Administrativa* y alegó la comisión de los siguientes errores:

> **PRIMER ERROR: Erró en derecho la Junta de Revisiones Administrativas de la OGPe al denegar el proyecto el cual fue recomendado favorable por el Municipio de Orocovis, sin objeción alguna al mismo.**
>
> **SEGUNDO ERROR: Erró en derecho la Junta de Revisiones Administrativas de la Oficina de Gerencia de Permisos ("OGPe") al confirmar la Resolución de la División de Revisiones Administrativas de la OGPe ya que actúo sin jurisdicción por ser una consulta de ubicación en Suelo Rústico Especialmente Protegido Agrícola (SRPA) sobre la cual el Secretario Auxiliar no tiene jurisdicción.**
>
> **TERCER ERROR: Erró la División de Revisiones Administrativas al confirmar la Resolución de la Oficina de Gerencia de Permisos (OGPe) sin haber aplicado el criterio de la intensificación del uso del terreno de acuerdo con el Plan de Uso de Terreno de 2015, documento rector en el desarrollo de terrenos en Puerto Rico.**
>
> **CUARTO ERROR: Erró la División de Revisiones Administrativas al archivar el caso, la propuesta,**

**confirmando así una acción ilegal de la OGPe y contrario a la sustancialidad del expediente.**

Examinado el recurso ante nuestra consideración, el 16 de marzo de 2026, le concedimos a la parte recurrida un término de veinte (20) días para fijar posición al recurso. En cumplimiento con nuestra directriz, el 27 de marzo de 2026, la parte recurrida presentó una *Oposición al Recurso de Revisión Judicial*. Contando con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

**II.**

**A. Revisión judicial de determinaciones administrativas**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, según enmendada, (3 LPRA sec. 9601 *et seq.*) (LPAU), se creó a los fines de uniformar los procedimientos administrativos ante las agencias. Consecuentemente, desde la aprobación del procedimiento provisto por la LPAU, los entes administrativos están precisados a conducir sus procesos de reglamentación, adjudicación y concesión de licencias y permisos de conformidad con los preceptos de este estatuto y el debido proceso de ley. *López Rivera v. Adm. de Corrección*, 174 DPR 247 (2008).

La Sección 4.2 de la LPAU, dispone que las decisiones administrativas finales pueden ser revisadas por el Tribunal de Apelaciones. (3 LPRA sec. 9672). La finalidad de esta disposición es delimitar la discreción de los organismos administrativos para asegurar que estos ejerzan sus funciones conforme a la ley y de forma razonable. *Simpson, Passalacqua v. Quirós, Betances*, 214 DPR 370 (2024). Véase, además, *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581 (2020); *Empresas Ferrer, v. A.R.Pe*, 172 DPR 254 (2007). Es decir, la revisión judicial permite a los tribunales garantizar que las agencias administrativas actúen dentro de los

márgenes de las facultades que le fueron delegadas por ley. *Voilí Voilá Corp., et al. v. Mun. Guaynabo,* 213 DPR 743 (2024). A su vez, posibilita el poder constatar que los organismos administrativos "cumplan con los mandatos constitucionales que rigen el ejercicio de su función, especialmente con los requisitos del debido proceso de ley". *Íd.* Así, la revisión judicial constituye el recurso exclusivo para revisar los méritos de una decisión administrativa sea esta de naturaleza adjudicativa o de naturaleza informal. *Voilí Voilá Corp., et al. v. Mun. Guaynabo, supra; Depto. Educ. v. Sindicato Puertorriqueño,* 168 DPR 527 (2006).

Es norma reiterada que las decisiones de los organismos administrativos están revestidas de una presunción de regularidad y corrección. *Transp. Sonell v. Jta. de Subastas ACT,* 214 DPR 633 (2024); *OCS v. CODEPOLA,* 202 DPR 842 (2019). Esto debido a que, mediante esta norma se reconoce el peritaje del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por ley.  *OCS v. Universal,* 187 DPR 164 (2012); *The Sembler Co. v. Mun. de Carolina,* 185 DPR 800 (2012).

Nuestro máximo Foro ha establecido que, al ejercer la revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia, sino que primero tienen que examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba. *Voilí Voilá Corp., et al. v. Mun. Guaynabo, supra; Otero v. Toyota,* 163 DPR 716 (2005).

Cónsono con lo anterior, la sección 4.5 de la LPAU establece que los tribunales deben sostener las determinaciones de hechos de las agencias si están basadas en "evidencia sustancial que obra en el expediente administrativo".  (3 LPRA sec. 9675).  Como vemos, la

norma anterior nunca ha pretendido ser absoluta. Por eso, el Tribunal Supremo ha resuelto con igual firmeza que los tribunales no pueden extender un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables, ilegales, o simplemente, contrarias a derecho. *Super Asphalt v. AFI y otro,* 206 DPR 803 (2021); *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117 (2019).

Sin embargo, la citada Sección 4.5 de la LPAU, *supra,* dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal". Aun así, se sustituirá el criterio de la agencia cuando no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo. *Rolón Martínez v. Supte. Policía,* 201 DPR 26 (2018). Por ende, los tribunales deben otorgar amplia deferencia a las decisiones de las agencias administrativas. Esto, en virtud de la experiencia y pericia que se presume que tienen esos organismos para atender y resolver los asuntos que le han sido delegados. Sin embargo, a la luz de *Loper Bright Enterprises v. Raimondo,* U.S., 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024) y *Vázquez v. Consejo de Titulares,* 2025 TSPR 56, 215 DPR ___ (2025), al revisar las conclusiones de derecho los tribunales pueden apoyarse, como lo han hecho desde el inicio, en las interpretaciones de las agencias.

Así pues, son las agencias las que tienen la responsabilidad de aplicar ciertas leyes. Sin embargo, tales interpretaciones "constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía" de conformidad con la APA; y no avalar ciegamente, como se solía hacer en el pasado. *Vázquez v. Consejo de Titulares, supra.* El foro judicial será quien deberá resolver todas las cuestiones de derecho pertinentes, las conclusiones e interpretaciones de las

agencias merecen gran consideración y respeto y la revisión judicial se limita a determinar si estas actuaron arbitraria o ilegalmente. *Íd.*

Lo anterior responde a la vasta experiencia y pericia que presumiblemente tienen estos organismos respecto a las facultades que se les han delegado. *Otero Rivera v. USAA Fed. Savs. Bank,* 214 DPR 473 (2024); *González Segarra et al. v. CFSE,* 188 DPR 252 (2013).

Por lo tanto, al momento de examinar un dictamen administrativo se determina que: (1) la decisión administrativa no está basada en evidencia sustancial; (2) la agencia erró en la aplicación de la ley (3) el organismo administrativo actuó de manera irrazonable, arbitraria o ilegalmente; o (4) su actuación lesiona derechos constitucionales fundamentales, entonces la deferencia hacia los procedimientos administrativos cede. *Empresas Ferrer v. ARPe, supra,* pág. 264.

En esta tarea, los foros judiciales analizarán los aspectos siguientes: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial, y (3) si las conclusiones de derecho fueron correctas. *Otero Rivera v. USAA Fed. Savs. Bank, supra; Asoc. Fcias v. Caribe Specially et al. II,* 179 DPR 923 (2010). Mientras que, las determinaciones de hecho se deben sostener si las mismas se basan en evidencia sustancial que surja de la totalidad del expediente administrativo, *Rolón Martínez v. Supte. Policía,* 201 DPR 26, *supra,* las determinaciones de derecho serán revisadas en su totalidad. Sección 4.5 de la LPAU, *supra;* Torres *Rivera v. Policía de PR, supra,* pág. 627.

Así pues, los tribunales deben ejercer un juicio independiente al decidir si una agencia ha actuado dentro del marco de sus facultades estatutarias. *Vázquez v. Consejo de Titulares, supra.* Pero principalmente, los tribunales no tienen que darle deferencia a la

interpretación de derecho que haga una agencia simplemente porque la ley es ambigua. *Íd.* Así, reiteramos que la interpretación de la ley es una tarea que corresponde inherentemente a los tribunales. *Íd.* Como corolario, al enfrentarse a un recurso de revisión judicial proveniente de una agencia administrativa, será el deber de los tribunales revisar las conclusiones de derecho en todos sus aspectos.

### B. Ley Núm. 161-2009

La Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161 de 1 de diciembre de 2009, según enmendada (23 LPRA sec. 9011) (Ley Núm. 161-2009), se creó a los fines de establecer el marco legal y administrativo que regirá la solicitud, evaluación, concesión y denegación de permisos por el Gobierno de Puerto Rico. Exposición de Motivos de la Ley Núm. 161-2009.

A tono con esto, el 16 de junio de 2023, se promulgó el Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios (Reglamento Conjunto), para establecer:

1. Un sistema uniforme de adjudicación.
2. Procesos uniformes para la evaluación y expedición de determinaciones finales, permisos y recomendaciones relacionados a obras de construcción y uso de terrenos.
3. Guías de diseño verde para la capacitación de los Profesionales Autorizados y cualquier otra persona que le interese certificarse bajo estas en Puerto Rico.
4. Procedimiento de auditorias y querellas a seguir por la JP, las Entidades Gubernamentales Concernidas, y los Municipios Autónomos con Jerarquía de la I a la III, según aplique.
5. Cualquier otro asunto que la Ley 161-2009 haya referido atenderse mediante reglamentación y aquellas específicamente concernientes a la OGPe. Tomo 1, Capitulo 1.2 del Reglamento Conjunto.

Asimismo, la Regla 1.6.2 establece que el Reglamento Conjunto tiene el propósito de detallar el sistema unificado de información relacionado al desarrollo y uso de terrenos, conforme a la política pública esbozada en la Ley Núm. 161-2009, *supra,* a través de normas claras, objetivas y uniformes para el manejo ágil y eficaz de procesos.

Cónsono con la controversia que nos ocupa, el Artículo 1.5 (14) de la Ley Núm. 161-2009, *supra,* define el término *consulta de ubicación* como el procedimiento ante la Oficina de Gerencia de Permisos o los Municipios Autónomos con Jerarquía de la I a la V, a los cuales se le haya delegado dicha facultad por medio del Convenio de Transferencia, para que evalúen, pasen juicio y tomen la determinación que estimen pertinente sobre propuestos usos de terrenos que no son permitidos ministerialmente y que no pueden considerarse mediante otro mecanismo. En áreas no calificadas incluye propuestos usos de terrenos que por su naturaleza y complejidad requieran un grado mayor de análisis. *Íd.*

Según el Artículo 6.3 de la Ley Núm. 161-2009 (23 LPRA sec. 9016g), la Junta Adjudicativa tendrá los siguientes deberes, facultades y funciones generales: (a) evaluar y adjudicar solicitudes de carácter discrecional; (b) evaluar y adjudicar asuntos en áreas no calificadas. En estos casos las determinaciones no establecerán una política general o definirán política pública, quedando esta responsabilidad en jurisdicción exclusiva de la Junta de Planificación; (c) celebrar vistas; (d) como parte de sus determinaciones, podrá hacer modificaciones o imponer cualquier condición necesaria para la aprobación de la solicitud; (e) descargar cualquier otra función que se le delegue mediante esta Ley. Además, dicho artículo establece que la Junta Adjudicativa solo podrá delegar las siguientes funciones: (a) la evaluación y adjudicación de toda consulta de ubicación y de enmienda a consulta de ubicación en aquellos casos en los que la solicitud no conlleve un cambio de calificación indirecto; (b) la evaluación y adjudicación de toda variación en uso que no conlleve el expendio de bebidas alcohólicas; que no generen polvo, ruido, emisiones atmosféricas, que no manejen, usen o vendan explosivos o venta de armas o que estén ubicados en suelos rústicos especialmente protegidos; (c) la

evaluación y adjudicación de todas las variaciones en lotificaciones que no conlleven más de un cincuenta por ciento (50%) de variación en la cabida permitida, estableciéndose que nunca se podrá delegar las variaciones en lotificaciones en terrenos clasificados como suelo rústico especialmente protegido. La Junta Adjudicativa y el Director Ejecutivo descargarán sus funciones en cumplimiento con el Plan de Usos de Terrenos, Planes de Ordenación Territoriales aplicables, los Reglamentos de Planificación, el Reglamento Conjunto y cualquier legislación y reglamentación aplicable. *Íd.* El Presidente será responsable de convocar las sesiones para atender los asuntos ante su consideración y de mantener la agenda de la Junta Adjudicativa dentro de los términos establecidos en el Reglamento Conjunto. *Íd.*

La Sección 2.2.3.2 del Reglamento Conjunto establece que: [r]equerirán la presentación de consulta de ubicación en las siguientes instancias:

a. Propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas calificadas.
b. Proyectos en los que se propone una densidad o intensidad mayor a la que permite el distrito en que ubica y no cumplen con el uso permitido en el distrito.
c. Propuestos usos de terrenos de carácter regional, subregionales y suprarregionales.
d. Propuestos usos de terrenos que por su naturaleza o intensidad requieren una ubicación especial o particular para atender situaciones especiales, tales como proyectos industriales como procesamiento de material de corteza terrestre, estaciones de trasbordo o de disposición final de desperdicios sólidos, entre otros.
e. Toda mejora pública excluyendo las transacciones de terrenos públicas exceptuando aquéllas que se declaran exentas mediante resolución por la JP o aquellas incluidas en la Regla 2.2.8 de este Reglamento Conjunto.
f. Proyectos en los que se propone una densidad o intensidad mayor a la que permite el distrito en que ubica o requieren un diseño particular para atender situaciones especiales, pero que no hay un distrito específico que tenga los parámetros necesarios.
g. Requerirán la presentación de consulta los proyectos en los que se proponga la construcción de una estructura que no satisfaga los requisitos de este Reglamento o el Código de Construcción adoptado por la OGPe en cuanto a parámetros de construcción y que, debido a la condición del solar, la ubicación especial o el uso particular, confronte una dificultad práctica y amerite una consideración especial, siempre que no se cree un perjuicio a las propiedades vecinas.

Asimismo, la Regla 6.1.19.1 del Reglamento Conjunto establece, sobre el Distrito Agrícola A-P: Agrícola Productivo, que:

a. Este distrito agrícola está compuesto por terrenos cuya continuidad en uso agrícola se declara de importancia para la Isla, y que pueden encontrarse en inactividad agrícola, sin que ello menoscabe su alto potencial agropecuario.

b. Además, puede incluir terrenos no urbanos ni desarrollados, llanos o semi-llanos, mecanizables, con instalaciones de riego o disponibilidad para ello o que por su condición natural no requieran riego; además, incluye aquellos que puedan ser mejorados de forma tal que los hagan aptos para uso agrícola productivo y con Clase de Capacidad Productiva de los Suelos del I al IV, según clasificados en el catastro de suelos del Servicio de Conservación de Recursos Naturales del Departamento de Agricultura Federal.

c. Se establece y utiliza para permitir usos en terrenos designados como reservas agrícolas con el fin de proteger los mismos y que puedan utilizarse en actividades agrícolas, su conservación, para su manejo adecuado, proteger recursos naturales, históricos y culturales, preservar cuencas hidrográficas y sistemas de riego y desagües, que puedan ubicar en los mismos y garantizar su utilidad como abasto de agua, así como de recuperación de terrenos agrícolas. En estos casos las disposiciones del distrito aplicarán a terrenos comprendidos dentro de la delimitación de cualquier Reserva o Corredor Agrícola, ya sea su delimitación a iniciativa de la JP a tenor con su Ley Orgánica o por mandato de cualquier Ley Especial promovida vía legislación.

d. El cambio de calificación en las reservas agrícolas no se permitirá en este distrito.

e. Este distrito en las reservas agrícolas no puede enmendarse a menos que sea para ampliar el mismo.

Cónsono con esto, la Sección 6.3.2.2 del Reglamento Conjunto establece que toda variación deberá ser solicitada por escrito por el dueño o un representante autorizado de la propiedad para la cual solicita la misma; señalando los motivos, fundamentos y razones en apoyo de su solicitud. Asimismo, la Sección 6.3.2.3 dispone las condiciones al otorgar variaciones:

a. El Secretario Auxiliar de la OGPe, los Municipios Autónomos con Jerarquía de la I a la III, a los cuales se le haya delegado dicha facultad por medio del Convenio de Transferencia, autorizará variación en construcción, lotificación u otras para los usos que tolera el distrito tomando en consideración, entre otros, los siguientes factores:

1. El solar tenga una condición particular que no permite que se cumpla con las disposiciones de este Reglamento.

2. El solar tenga una ubicación especial o el uso particular confronta una dificultad práctica y amerita una consideración especial.

3. La variación solicitada no perjudica propiedades vecinas, la disponibilidad de infraestructura y el ambiente del vecindario.

4. No se afecte el uso agrícola, la productividad agrícola de los terrenos, los recursos naturales, históricos o culturales existentes, si alguno.

5. Para variar los parámetros de construcción sobre densidad e intensidad, el uso propuesto deberá ser uno contemplado en el distrito en que ubica.

6. La magnitud de la variación es la necesaria para asegurar la viabilidad del uso permitido y no es viable considerar otras alternativas para salvar el problema presentado.

b. En las Áreas de Planificación Especial, el Secretario Auxiliar de la OGPe especificará la naturaleza y extensión de las variaciones en construcción u otras variaciones y también prescribirá aquellas condiciones que a su juicio son necesarias para asegurar el cumplimiento de los criterios que se establecen en esta Sección.

c. Las variaciones autorizadas quedarán sujetas al cumplimiento de las condiciones que se establezcan y a las demás disposiciones de ésta o de cualquier otra reglamentación aplicable.

d. El incumplimiento de cualquiera de dichas condiciones constituirá una violación a este Reglamento y podría constituir base suficiente para la revocación de la variación en todas sus partes.

Sin embargo, no podrá autorizarse una variación en construcción, lotificación u otras, en todo o en parte, a menos que: a. Que la variación sea necesaria para la preservación y el disfrute de un derecho de propiedad y se demuestre que la variación aliviará un prejuicio claramente demostrable; b. Que la autorización de tal variación no afectará adversamente el disfrute y valor de las pertenencias cercanas en el uso presente y para cualquier otro uso futuro permitido; c. Que el peticionario, a su vez, está en disposición de aceptar las condiciones y requisitos adicionales a los requisitos reglamentarios que el Secretario Auxiliar de la OGPe o Municipio Autónomo con Jerarquía de la I a la III le imponga para beneficio o protección del interés público; d. Solicitar comentarios a la Unidad de Hidrogeología de la JP en áreas propensas a inundaciones o a deslizamientos de terrenos; e. No afecte la integridad ecológica de la Reserva Agrícola, Natural, Áreas de Planificación Especial o se ocasione peligro a los recursos naturales, históricos, culturales o agrícolas existentes. Sección 6.3.2.4 del Reglamento Conjunto.

## C. Planificación y Ordenamiento Territorial

El Artículo 6.004 de la Ley Núm. 107 de 13 de agosto de 2020, según enmendada (21 LPRA sec. 7854), conocida como Código Municipal de Puerto Rico, establece que los suelos en Puerto Rico son limitados y es política del Gobierno de Puerto Rico propiciar un uso juicioso y un aprovechamiento óptimo del territorio para asegurar el bienestar de las generaciones presentes y futuras,

promoviendo un proceso de desarrollo ordenado, racional e integral de los mismos.

El proceso de ordenación del territorio, cuando se desarrolle a nivel del municipio, se realizará mediante Planes de Ordenación que contendrán las estrategias y las disposiciones para el manejo del suelo urbano; la transformación del suelo urbanizable en suelo urbano de forma funcional, estética y compacta; y la conservación, protección, y utilización —de forma no urbana— del suelo rústico. *Íd.*

En particular, el Código Municipal de Puerto Rico autoriza a los municipios a adoptar los Planes de Ordenación. Artículo 6.006 del Código Municipal de Puerto Rico (21 LPRA sec. 7856). Estos Planes de Ordenación constituirán instrumentos del territorio municipal. *Íd.* Ante ello, el Municipio de Orocovis estableció un Plan de Ordenación Territorial. Dicho Plan de Ordenación Territorial, fue aprobado por la Junta de Planificación y, además, adoptó el Reglamento Conjunto.

De otro lado, en cuanto a las urbanizaciones y lotificaciones, la Sección 5.1.2.1 del Reglamento Conjunto establece que los proyectos de urbanización se considerarán por la OGPe o el Municipio Autónomo con Jerarquía de la I a la III, conforme a las leyes y reglamentos aplicables, de acuerdo a lo siguiente: a. se presentará en un Municipio Autónomo, conforme a lo establecido en el Convenio y el Plan de Ordenación Territorial; b. cuando no exista un Plan de Ordenación Territorial o no se hayan transferido las delegaciones correspondientes, los proyectos de urbanización se presentarán ante la OGPe conforme al Reglamento.

Así pues, para todo proyecto de urbanización, incluyendo urbanizaciones vía excepción, se tomará en consideración el riesgo a deslizamientos y otras condiciones del subsuelo mediante la presentación de un estudio geotécnico certificado por un ingeniero

licenciado que evalúe la geología e hidrología del terreno, presencia de fallas geológicas, historial de deslizamientos en la zona, susceptibilidad del terreno a los mismos, topografía, presencia de materiales de depósitos de deslizamientos (QI) según descritos en los cuadrángulos geológicos de Puerto Rico por el USGS y las propiedades ingenieriles del subsuelo, entre otros. Sección 5.1.2.2 del Reglamento Conjunto. El mismo debe establecer las medidas que se tomarán en consideración para reducir efectos de licuación, localización de estructuras sobre terrenos susceptibles a sumideros, reducir asentamientos y evitar deslizamientos de terreno, entre otros. *Íd.*

Cónsono con ello, la Sección 5.1.2.3 dispone, entre otras cosas, que no se tramitarán como lotificaciones aquellas propuestas en terrenos que ubique en Suelo Rústico Especialmente Protegido (SREP). Para el Suelo Rústico Especialmente Protegido – Agrícola se dispone que, el objetivo es orientar para que los terrenos con valor agrícola o pecuario, con actividades presentes o potenciales, se protejan para que puedan dedicarse a las actividades agrícolas. Es la única categoría que la Ley Núm. 550, Ley para el Plan de Uso de Terrenos, según enmendada por la Ley Núm. 6 del 3 de enero de 2014, requiere garantizar que se reserven un mínimo de 600,000 cuerdas de terreno agrícola. El Plan de Uso de Terrenos y todos los instrumentos de planificación establecerán un proceso para garantizar que se preserven los terrenos aptos para la producción agrícola y crianza de animales, cumpliendo con los siguientes objetivos: (i) fomentar y mantener las actividades agrícolas en los terrenos con potencial para ese uso, a través de la clasificación y calificación, y el uso de las nuevas competencias como las transferencias de derechos de desarrollo y la reparcelación; (ii) desalentar el desplazamiento de usos agrícolas mediante la introducción de usos residenciales próximos a los lugares donde se

están llevando a cabo actividades agrícolas, para evitar el conflicto con estas y garantizar el derecho del agricultor a mantener su actividad agrícola; (iii) detener la lotificación indiscriminada de los terrenos agrícolas en parcelas o fincas pequeñas, a los fines de preservar las fincas en unidades del tamaño adecuado para que su operación agrícola sea económicamente viable, utilizando los siguientes criterios normativos: (a) determinar la deseabilidad de una lotificación, evaluando y dando máxima ponderación a los usos contemplados para las parcelas o fincas a crearse; (b) fomentar la integración de nuevas lotificaciones en núcleos residenciales existentes, a los fines de desincentivar la creación de nuevos núcleos poblacionales que incrementen los costos de la infraestructura y de los servicios públicos; (c) estimular que las parcelas a formarse para actividades no agrícolas sean lo más pequeñas posible, según el uso propuesto, las condiciones del terreno y disponibilidad de instalaciones; (d) utilizar como criterio primordial que los terrenos a retirarse para fines no agrícolas sean los que tenga el menor impacto sobre el nivel de producción de la finca; (e) desestimular la pérdida de terrenos agrícolas producto de las lotificaciones de fincas que constituyen unidades de producción agrícola. (iv) fomentar la ubicación de actividades complementarias a los usos agrícolas en terrenos menos productivos para que se afecte mínimamente su nivel de producción agrícola. Fomentar la práctica de medidas y programas orientados a la preservación de los suelos, a los fines de evitar la erosión, proteger la productividad de los terrenos, y minimizar el impacto en la calidad de nuestros abastos de agua y el deterioro de otros recursos naturales como consecuencia de la actividad agrícola; y, (v) utilizar los mecanismos de transferencia de derechos de desarrollo para conservar los terrenos susceptibles a estos riesgos libres de construcciones que puedan estar expuestas a los mismos.

## D. Vistas

La Sección 11.1.2.9 del Reglamento Conjunto establece, entre otras cosas, que:

a. La División de Revisiones Administrativas podrá realizar vistas en las cuales podrá recibir prueba adicional que sustente las alegaciones de las partes y le permita adjudicar el caso. El Juez Administrativo podrá señalar vista, a iniciativa propia o a petición de parte, para escuchar al peticionario o a las partes en cuanto a los méritos de la revisión ante su consideración.
b. La División de Revisiones Administrativas notificará por escrito la fecha, hora y lugar en que se celebrará la vista a las partes. Dicha notificación se realizará por correo electrónico o correo regular a las direcciones postales que obren en el expediente del caso, según provistas por la parte recurrente. La misma se realizará con no menos de quince (15) días de antelación a la fecha de la vista, excepto que, por causa debidamente justificada consignada en la notificación, sea necesario acortar dicho período.
c. La notificación de la vista contendrá:
1. Fecha, hora y lugar en que se celebrará la vista, así como su naturaleza y propósito.
2. Deberá especificar qué aspectos de la decisión han de ser revisados, o si el caso ha de verse en su totalidad.
3. Advertencia de que las partes podrán comparecer asistidas de abogados, pero no estarán obligadas a estar así representadas.
4. En el caso de las corporaciones o asociaciones, la persona que comparezca deberá presentar el documento que acredite su capacidad representativa. Un ciudadano no podrá representar a otro a menos que esté debidamente autorizado a practicar la abogacía en Puerto Rico.
5. Cita de la disposición legal o reglamentaria que autoriza la celebración de la vista.
6. Apercibimiento de las medidas que podrán tomarse si una parte no comparece a la vista.
7. Advertencia de que la vista no podrá ser suspendida, salvo solicitud según dispone este reglamento.

Cónsono con ello, la Sección 3.9 de la LPAU (3 LPRA sec. 9649) establece que:

[l]a agencia notificará por escrito a todas las partes o a sus representantes autorizados e interventores la fecha, hora y lugar en que se celebrará la vista adjudicativa. La notificación se deberá efectuar por correo, ordinario o electrónico, o personalmente con no menos de quince (15) días de anticipación a la fecha de la vista, excepto que, por causa debidamente justificada consignada en la notificación, sea necesario acortar dicho período, y deberá contener la siguiente información:
(a) Fecha, hora y lugar en que se celebrará la vista, así como su naturaleza y propósito.
(b) Advertencia de que las partes podrán comparecer por derecho propio, o asistidas de abogados incluyendo los casos de corporaciones y sociedades.
(c) Cita de la disposición legal o reglamentaria que autoriza la celebración de la vista.
(d) Referencia a las disposiciones legales o reglamentarias presuntamente infringidas, si se imputa una infracción a las mismas, y a los hechos constitutivos de tal infracción.
(e) Apercibimiento de las medidas que la agencia podrá tomar si una parte no comparece a la vista.
(f) Advertencia de que la vista no podrá ser suspendida.

### E.  Rebeldía

La Sección 2.1.10.11 del Reglamento Conjunto dispone que:

> Si una parte debidamente citada no comparece o participa en la conferencia con antelación a la vista, a la vista pública o a cualquier otra etapa durante el procedimiento adjudicativo, el funcionario que presida la misma podrá declararla en rebeldía, multarla y continuar el procedimiento sin su participación, pero notificará por escrito a dicha parte su determinación según la Regla 2.1.7 (Notificaciones), los fundamentos para la misma, el recurso de revisión disponible y el plazo para ejercerlo.

### III.

La parte recurrente recurre de una *Resolución de Revisión Administrativa* emitida por la DRA y aduce que erró en derecho la Junta de Revisiones Administrativas de la OGPe al denegar el proyecto el cual fue recomendado favorable por el Municipio de Orocovis, sin objeción alguna al mismo. Asimismo, coligió que erró en derecho la Junta de Revisiones Administrativas de la OGPe al confirmar la *Resolución de Revisión Administrativa,* ya que actuó sin jurisdicción por ser una consulta de ubicación en Suelo Rústico Especialmente Protegido Agrícola sobre la cual el Secretario Auxiliar no tiene jurisdicción.

Añadió que, erró la DRA al confirmar la *Resolución de Revisión Administrativa* sin haber aplicado el criterio de la intensificación del uso del terreno de acuerdo con el Plan de Uso de Terreno de 2015, documento rector en el desarrollo de terrenos en Puerto Rico. Por estar íntimamente relacionados, discutiremos los primeros tres (3) señalamientos de error de forma conjunta.

Surge del expediente ante *nos* que, la parte recurrida presentó una consulta de ubicación ante la OGPe para la lotificación de veintinueve (29) predios. Dicho proyecto ubica en el Barrio Gato del Municipio de Orocovis y se encuentra en un distrito calificado como Agrícola Productivo, según el Plan de Ordenamiento Territorial para el Municipio de Orocovis. Asimismo, conforme al Reglamento

Conjunto el suelo de dichos predios es un Suelo Rústico Especialmente Protegido Agrícola.

Ante tal solicitud, la OGPe emitió una *Resolución de Consulta de Ubicación* no favorable para la consulta de ubicación. Inconforme, la parte recurrente presentó una *Solicitud de Reconsideración* ante la DRA. Subsiguientemente, la DRA emitió una *Notificación Acogiendo Solicitud de Revisión Administrativa* y, posteriormente, la DRA emitió un *Aviso de Vista de Revisión Administrativa* mediante la cual señaló una Vista Administrativa. A dicha Vista Administrativa, la parte recurrida no compareció.

Luego de analizado cuidadosamente el expediente ante nuestra consideración y el derecho aplicable, determinamos confirmar la *Resolución de Consulta de Ubicación.* El desarrollo propuesto no cumple con los postulados del Plan de Uso de Terrenos de Puerto Rico, ni con el Reglamento Conjunto. Hay que hacer notar que, el Código Municipal de Puerto Rico establece que es política del Gobierno de Puerto Rico propiciar un uso juicioso y un aprovechamiento óptimo del territorio para asegurar el bienestar de las generaciones presentes y futuras, promoviendo un proceso de desarrollo ordenado, racional e integral de los mismos. Artículo 6.004 del Código Municipal de Puerto Rico, *supra.*

Así, el desarrollo del suelo propuesto promueve la lotificación de terrenos agrícolas calificados como Suelo Rústico Especialmente Protegido-Agrícola. Según la Sección 6.3.2.3 del Reglamento Conjunto, se autorizará la lotificación de un terreno para los usos que tolera el distrito tomando en consideración, entre otros, que no se afecte el uso agrícola, la productividad agrícola de los terrenos, los recursos naturales, históricos o culturales existentes, si alguno. Así pues, permitir la lotificación propuesta, estaría afectando la productividad agrícola de los terrenos, así como su valor natural.

En consecuencia, no erró la DRA al confirmar la *Resolución de Revisión Administrativa* emitida por la OGPe que determinó como no favorable la solicitud de consulta de ubicación propuesta. La OGPe no actuó de manera irrazonable, arbitraria o ilegalmente. Por lo cual, se sostiene su determinación.

De otro lado, la parte recurrente indicó que erró la DRA al archivar el caso, la propuesta, confirmando así una acción ilegal de la OGPe y contrario a la sustancialidad del expediente. No le asiste la razón.

Surge del expediente ante *nos* que, la parte recurrida fue debidamente citada a la Vista Administrativa mediante un *Aviso de Vista de Revisión Administrativa.* Llegado el día de la Vista Administrativa, compareció el Ing. Rafael Ángel Zayas Rolón, no así la parte recurrente. En consecuencia, la DRA procedió a anotarle la rebeldía y a archivar la *Solicitud de Reconsideración.* Dicha acción fue correcta en derecho y cónsono con lo establecido en la Sección 2.1.10.11 del Reglamento Conjunto.

**IV.**

Por los fundamentos antes expuestos, *confirmamos* el dictamen recurrido.

Lo acordó y manda el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones